and Human Services, Mr. Gaynor, whenever you're ready. Good morning, Your Honors, and may it please the Court. This case presents, at its core, the same question that was addressed in Millett v. Secretary of Health and Human Services on May 20th of this year, and as to which a certiorari petition is now pending. So you recognize that we don't have the authority to overturn another panel decision at this level, correct? Yes, Your Honor. Under Circuit Rule 35A, a party may argue in its brief and an oral argument over rule, and the panel will decide whether to ask for rehearing en banc. And that is why I'm here today, because I believe that, and the petitioners believe, that Millett should be overruled. And the procedural avenue for this is for petitioners to come before this Court, this panel, and ask that the matter be referred to the en banc panel. So you want us to recommend to the full Court that this case be heard en banc? Yes, Your Honor. And we believe there are substantial, very substantial reasons that that should... But in that regard, doesn't it make sense if a cert petition is pending, to see what happens in that regard? Well, Your Honor, in a sense, a cert petition is always a speculative matter. And as the Court is well aware, if the Supreme Court denies cert, as it does in the vast majority of cases of any sort whatsoever, that itself does not send a precedential signal one way or the other. That's certainly an option that's available and open to this Court. But obviously, if the Court wants to take that view of the case, then perhaps it should hold this case in abeyance. Well, but you are arguing the alternative. Why don't you make the assumption that we are bound by precedent, and so unless and until there's a rehearing petition or a cert petition granted, we're going to apply current law. Yes, or under rule 35A, which is why I'm here today, recommend to the en banc panel that Millick and this issue be... that the issue resolved in Millick be reconsidered in this case, and that Millick be overruled. First, I'd like to talk briefly about stare decisis and why I believe and why I think the cases strongly suggest that stare decisis is not an important consideration, which should influence this Court strongly to not grant rehearing in this case. Stare decisis is an important consideration, but it's a principle of judicial policy, as the Supreme Court has emphasized, and not an inexorable command. And the Court has also made clear, and when I say the Court, I mean the Supreme Court, has made clear that it is at its zenith in cases concerning statutory interpretation and at its nadir, at its weakest, in cases concerning constitutional interpretation. And I didn't brief this issue because when I was doing the briefing, Millick was not final. The cases to that effect are Monell v. Department of Social Services, 436 U.S., 658 and 695, and more recently, Veith v. Jubilier, 541 U.S., 267 and 305. Are you familiar with footnote three in Millick? That's the one where the Court says that the stern was narrowed in the wellness case? Do you have a response to that? Well, Your Honor, the Court seems to say that stern was narrowed in the wellness case because wellness said, well, if there's consent of the parties, then the Article III implications don't come in this way. And that's certainly true if the parties consent to it, and that was clear in the stern. In the situation in the stern, Your Honor, the bankruptcy creditor had no choice but to follow and bring the case in bankruptcy court. So the stern court held that he couldn't properly consent, that that wasn't a valid consent for Article III purposes, and he hadn't waived whatever Article III rights he could otherwise assert. The same situation is true here for reasons that have to do with the Millick's Court's misapplication and misunderstanding of Griswitz and of the structure of the Vaccine Act and its predictive effect. Essentially, my clients, the petitioners and other people in their situation, have no alternative, and therefore, just like the bankruptcy creditor in stern, they can't effectively consent because, and this is the language from stern, they have nowhere else to go. That's incorrectly the language from stern, and the stern court says, unequivocally, that means they didn't consent. The same situation obtains in this case because there is no, for petitioners whose claims are of the nature of these claims, which are of the nature of design defect claims. They have nowhere else to go. The Millick Court was simply wrong, simply, and I say this all respectfully, but the Millick Court was wrong, Your Honors, to say that the Millicks could revisit that issue in an Article III court or presumably in a correlative state court. And the reasons can be seen when you look at the structure of the Vaccine Act, the structural quid pro quo that Congress was working there and what they intended to achieve in the Vaccine Act, and then when you look at Brucewitz and Brucewitz's straightforward interpretation of what Congress intended to achieve. Stepping back and looking at the picture, what you see is that the Vaccine Act and the compensation scheme under the Vaccine Act is essentially a structural quid pro quo, as the Brucewitz Court says, to the vaccine manufacturers. Congress has said to the vaccine manufacturers, we want to protect you from being sued and having outrageous verdicts that could, huge verdicts, I shouldn't say outrageous, but very large verdicts that could drive you out of the vaccine market. So we will set up this structural quid pro quo. You will be immune, to a large extent, from liability. You'll be immune. You can't be sued. And then, in return, the government will take a little chip of money from every vaccine that's given to anyone in the United States and put that little chip, that penny or fraction of a penny, into the pot of the Vaccine Injury Trust Fund. And then, when petitioners claim, as they will in some small fraction of cases, because they're unavoidably dangerous vaccines, but only to a very, very small number of people, which is why Congress has wisely said, we need this act to encourage vaccines in the vast majority of circumstances, when somebody comes in with a claim, they sue not the vaccine manufacturer, but the party that's been substituted for the vaccine manufacturer by Congress. And that party is the Secretary of Health and Human Services. So, in that sense, they don't have a choice. They're not given the option of going into federal court, under the diversity jurisdiction, or into state court and saying, my child, or I, was injured by an unavoidable consequence of these vaccines. Not by a manufacturing defect, because we can't allege one. In most cases, there aren't. The manufacturing process is extremely strictly regulated, down to the temperature of the facilities in which the vaccines are manufactured. And therefore, manufacturing defect claims, which are not preempted, are a very, very small fraction of the universe of potential claims. Failure to warn claims, which are the other of the, what Bruce Woods called the classic triumvirate of product liability claims, failure to warn claims are expressly precluded under the Vaccine Act. If the warnings are given in accordance with federal regulations, there's no lawsuit. That's that. So that leaves only the design defect, or cases in the nature of design defect cases. And so what you have is that that's the compensation, excuse me, that's the structural quid pro quo, that the Supreme Court found was so important. Now what Millick said, and Millick was, I respectfully submit, profoundly mistaken at this point. And that's why it should be, one of the two reasons it should be overruled. And what it said was, well, the Millicks can just go in and file a manufacturing defect claim. Well, of course they can't, because they can't allege a manufacturing defect claim. There's no reason to believe one. This, like most of these cases, involves the unavoidable side effects of the vaccine. Well, then the medical court said you could just allege that as breach of implied warranty, or breach of contract. Well, as to breach of contract, there's a privity problem in most states, but even aside from that, if you look at the product liability cases, and I've cited a few in the literature, what they say is that for product liability purposes, breach of implied warranty is essentially another way to plead strict design defect product liability. It's essentially coextensive. And I've cited the cases that say that from various circuits, from a couple circuits. And the law is generally pretty clear on this, that if you can't allege a design defect, you're not going to be allowed to plead around that by alleging a breach of implied warranty that is essentially saying you breached your implied warranty because you sold me an unavoidably defective product. It's essentially the same pleading. But if you were allowed to do that, as the millet court suggests, these people can just go in and file in federal court or state court, then essentially what you've done, look back at the structural quid pro quo, you have vanquished, you have struck down the manufacturer's shield that they got, the structural quid pro quo, the protection that they got from being sued in civil court. Mr. Gaynor, can I ask you a question? Yes. You argue to change gears a little bit, perhaps. You argue, I believe, that under whatever standard of review is applied, that you should prevail, correct? That is correct. I just wanted to ask you a little bit about that. I went over the decision of the Court of Federal Claims and the underlying decision of the special master. The special master's decision, which is basically what we're reviewing as I understand it, is exhaustive. It looks at every point, says here's why I credit this witness, here's why I don't credit this witness, examines everything from six different angles it seems. It struck me as difficult to say how whether under an arbitrary or capricious standard, which is what you're saying is wrong, or a more exacting standard of view, we could overturn that. Could you speak to that? Well, yes, Your Honor, I'd be glad to. And here we have the special master, and she goes through, and with all due respect to the special master, she goes through every piece of evidence, and she resolves every possible inference in favor of the government. Where there's anything to resolve, it's the finder of fact. She takes it in favor of the government, and every possible inference against the petitioners and their experts. And when she does that, first of all, that itself should, well, that has Article I implications itself, because if that's reviewed on arbitrary… You're saying that in itself is kind of a red flag? I think it is, Your Honor, with all due respect. And then secondly, getting down to the specifics. So the special master says, and this is complicated, and I don't want to spend all of my time on this, but I think that just to give you a sense of why this shouldn't meet the arbitrary and capricious standard, and we've tried to lay that out in our briefs, hopefully successfully, but one of it is she rejects, she says, this child does not have a mitochondrial disorder. Doesn't have one, period. That's her finding of fact. Now, to do that, she has to reject not just Dr. John Schaffner, who is one of the preeminent physicians in the United States on mitochondrial disorders, and is also a treating physician in this case, but she has to ignore essentially what the government own expert, Dr. Cohen, says. Dr. Cohen says that the published diagnostic paradigms, the Mernier criteria, for example, and I quote, are not meant to account for all clinical outcomes, and not designed to address incongruent data, and ultimately it is up to the clinician to determine whether a mitochondrial disorder is present. That's what the government's own expert says, and she has to ignore that essentially to come to her own conclusion. So that is, on that standard, arbitrary and capricious, and as to the question of the closely related question of the normalization of the Bernier criteria, she says, well, it's not the gold standard because, Dr. Cohen said, there is no gold standard, but she says it's still pretty useful, but Dr. Cohen says, in fact, I use it, but my colleague at the Cleveland Clinic, Dr. Hoppell, doesn't. We fight about this all the time. Ultimately, it's a matter of clinical judgment, and the normalization is, in his words, a bit arbitrary anyway. So how confident could a reasonable trier of fact be in that kind of evidence when the government's own expert won't come in and deal with it? And then there are other big problems with the findings of fact here. As to the speech delay of this child, which assertedly predated the flu vaccine. You're talking now about the conclusion that autism manifested itself in various ways through the video, etc., before these two vaccinations. Yes, exactly, Your Honor. I should have made that transition more explicit. I jumped right to it, but you're exactly correct. As to that, the speech delay, the government's own expert, Dr. Miller, says it's not even anymore a diagnostic criteria of autism, of ASD. It's not used anymore, but the special master seems to think it's still useful, even though it's been abandoned as a diagnostic criteria. Well, somehow it still is. That seems to be the government's position. Then we have the question of, well, we have all these treating physicians who saw this child, who saw the videotapes, and pediatricians who looked. They didn't see any signs of ASD in this child prior to the vaccines. The government hires the expert, a psychologist, not a physician, to go back and look at the videotapes from years ago. And she says, well, these videotapes show signs of ASD, which no one at the time would have been expected to see, because they weren't developed at that time, but now we can see them. And then on examination, she says, well, why didn't they see them? Well, and this is her language, because the signs of behavior in the child, supposedly giving rise to now a clinician's view of what might be ASD, were, and I quote once again, too close to normal, unquote. In other words, they're extraordinarily weak, because they're the signs that any normal child would have, and now they've gone back and reinterpreted that to mean autism spectrum disorder, ignoring all the pediatricians at the time, and every other doctor who testified in this, and crediting this clinical psychologist, who was not a treating physician. So under these standards, I think it can't survive the arbitrary and capricious, but even if it could, Your Honor, I think this case is extraordinarily weak. Now when we look at the standards of review, the arbitrary and capricious standard is the most maximally deferential standard known to federal law. It wasn't the expert that the government relied on who looked at the videotapes. I'm trying to find it right now, but if I recall, she had the job of diagnosing autism and had done so for many, many patients. Am I correct in what you're saying, Your Honor? I think that is correct, Your Honor. She was at the Philadelphia Children's Hospital, if I recall correctly, and yes, she is a psychologist who specializes in autism. And so is your position that the special master erred in relying on her testimony? Well, Your Honor, when the special master relied on that testimony, she chose to disregard a lot of other testimony. And you can rely on that testimony, but if the standard of arbitrary and capricious allows picking out little bits of evidence, essentially, and not looking at the way that the expert has essentially allowed herself to be impeached on the stand by signs that she says are so close to normal that no reasonable doctor would be expected to look at them, and I, the expert, with the benefit of many years' hindsight, can now see under diagnostic criteria that didn't apply at the time, that yes, that looks arbitrary and capricious. It's ignoring the vast majority, the great weight of the evidence, picking out little bits of evidence and hanging one's hat on it. You can go exhaustively through almost any complex record and find something that supports an aberrational view of the facts. And with all due respect, I think that's what's happened here. Okay. You've exceeded your time. Why don't we hear from the government and we'll restore two minutes of rebuttal. Thank you. Sure. Ms. Perlman, good morning. Good morning. May it please the court. Perhaps not surprisingly, the government believes that the Millick panel properly decided the constitutional issue. For 25 years, the standard of review that was set forth in Hines and reaffirmed in Munn and reaffirmed pretty much by every panel that has considered findings of fact in front of this court has determined that the arbitrary and capricious standard is the correct standard of review. The petitioners, as you know, filed for rehearing and bonk in Millick, and that was denied. So they did exhaust their review in this court. And there's a cert petition. Was it filed last Thursday? I believe it was. I have not seen it yet. But I gather from what was being said that it was the same thing that was in the on-bonk briefing. So obviously we request that this court evaluate the case under the standard of review that has been in place for 25 years. In this causation in fact case, it was petitioners' burden to demonstrate with preponderant evidence their contention that two flu vaccines injured their child. And after, and you said it very well, Judge Schall, it was an exhaustive review that the special master undertook. She looked at hundreds of exhibits, 1,800 pages of testimony that covered more than a dozen fact and medical witnesses and concluded that petitioners failed to meet their burden. The decision is 161 pages long, and she meticulously examined and weighed all of the evidence and provided sound rationale for each of her conclusions that the critical factual predicates on which appellant's allegations were based were not supported by the evidentiary record. My colleague went through some, picked out some things that he believes were arbitrary and capricious. And I believe that the decision clearly sets forth why that is in fact not the case. Take for instance the diagnosis of mitochondrial disorder. There is no doubt that diagnosing mitochondrial disease involves an analysis of a number of signs and symptoms. You have to look at lab data. You have to look at clinical data. And the special master did. We had two preeminent mitochondrial specialists, Dr. Cohen, who is a clinician and a pediatric neurologist and mitochondrial specialist, and Dr. Wallace, who does mitochondrial biology. He just looks at the labs. And they said it does not meet the standard. It does not meet any standard. That is true there is not one generally accepted criteria, but it does not meet any standard. Now part of the problem with petitioner's case is that their expert, Dr. Kendall, said, I think he has mitochondrial disease because he meets this Bernier criteria. But when she was questioned on why he meets these different criteria, her opinion completely crumbled. She started backing off from that. I believe if you look through the evidence in the 22 pages that the special master spent going through the evidence, it is clear that petitioners failed to offer reliable, persuasive evidence that the child has a mitochondrial disorder. And instead she credited respondents experts. Another piece of evidence that my colleague pointed out is the testimony of Dr. Miller and the issue of whether or not the autism predated the vaccines. Dr. Miller is one of the preeminent specialists in diagnosing autism. It is the job of a clinical psychologist like Dr. Miller to diagnose autism. Dr. Shafrir admitted that. He said, we asked the psychologist what the diagnosis is. He just treats them. So the special master's reliance on Dr. Miller to go through the videotapes and identify, and there were 88 videotapes. These were hours and hours. And she took us through and showed us exactly where she believed these symptoms were manifesting. And the special master credited that. She had every right to credit it, in part because of Dr. Miller's credentials, in part because it was what she was seeing with her own two eyes, and in part because Dr. Cohen, a pediatric neurologist who does deal with children with developmental delays in autism, corroborated everything that Dr. Miller said. So it was certainly not arbitrary, capricious, and under any standard of review, we believe that the special master's findings were correct. The one other factual issue that did not come up that the special master decided was that there was no regression in temporal proximity to either vaccine that was given, and we believe that the record clearly supports the special master's determination. There was nothing in the contemporaneous medical records describing the developmental regression that petitioners were claiming existed. There's nothing in the videos. There's nothing in the early medical histories. For months and months and months, there's no mention of this supposed complete deterioration in this child's development. This finding was important because both Dr. Kendall and Dr. Shafir's causation opinions relied heavily on the supposition that onset of the ASD was temporally related to the administration of the flu vaccines. But it wasn't. It predated the vaccines, and it did not get worse over time. It just followed the natural course of autism. This is not a close case. As the special master noted, it was abundantly clear that petitioners' theories of causation were speculative and unpersuasive, and respondents' experts were far more qualified, better supported by the weight of the scientific research and authority, and simply more persuasive on nearly every point in contention. And that is why the special master found her respondent on all of these issues, because our case and our evidence was stronger, and that was in her role as the fact finder to do. On appeal, Judge Braden of the Court of Federal Claims could not find any error with the special master's factual findings and found her conclusions to be dispositive of the case, so she affirmed. Wait. She did take issue with something the special master did, right? She did, and we disagree. She found that the special master required medical literature to support the causal. Scientific literature. Correct. We do not believe that is the case. But because the factual issues were dispositive, that is the issue that's being addressed on appeal. But we respectfully request that this court affirm. Thank you very much. Thank you. Very briefly, Your Honors, I'd like to go back to the question of whether Millick should be revisited, whether this court should refer it to an end-back panel, because the other problem with Millick, aside from the fact that it got the preemption scope wrong and completely allows the piercing of the vaccine shield, of the liability shield for vaccine manufacturers, is that it makes an Article III ruling without referring to the central part of the Article III doctrine in Supreme Court cases. You look at Stern, Stern v. Marshall, which is the most recent lengthy discussion of Article III. It goes through, as cases have before it, many cases, and talks about the public rights, private rights distinction. And what it says is that if you're on the private rights side of this, if there isn't a right that is inherently one against the public, then you have protection by Article III. And it goes through a number of factors. Was this a substitute for an action that existed in common law? And clearly, at this case, it was. When you have a case like this under the Vaccine Act, if there were no Vaccine Act, petitioners would be suing in state court, or perhaps under diversity jurisdiction, and getting in front of the jury. So it's clearly a substitute for that. When you look at other factors, such as does the federal scheme give the right to the district court to enter judgment, and therefore treat the Article I court like a bankruptcy court, as just advisory. And in this case, if you look at the statute, and I've pointed this out in the papers, it gives the Court of Federal Claims the power to enter judgment. We can appeal to this court, but that court has that power, and the Supreme Court has found that to be significant. And then it's a question of whether this is a right that is a substitute. Well, it is a substitute. The factors we went through are the factors that Stern looks at, and the Supreme Court looked at in many other cases, Commodity Futures Trading Commission v. Shore, Thomas v. Carbide, etc., and there are a long line of cases in which the court looks at these factors and says, well, you're on the public rights exception side, or you're on the private rights exception side, and therefore Article III is or isn't invoked. But in Millick, there is no recognition that this distinction even exists. It's not mentioned in Millick. So what Millick does is decide a very important Article III question without acknowledging, referencing, noting that the Supreme Court has rules for this, much less applying them. There's no reference given to this. And in that sense, even if the court were to come to the same conclusion, it should do it the right way and apply the factors. But I submit respectfully that when the factors are applied, because this is the kind of case which would have been a suit against the vaccine manufacturers at Commodore, Article III is not irrelevant. It applies. Thank you. We thank both parties, and the case is submitted. Thank you.